CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 SEP 24 PM 4: 18

DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | | |
|---|---|---|
| **TIGE BOATS, INC.,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 1:15-CV-114-P-BL** |
| **INTERPLASTIC CORPORATION AND NORTH AMERICAN COMPOSITES COMPANY,** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge** |

**REPORT AND RECOMMENDATION**

This matter is before the Court on a Motion to Compel Arbitration and to Stay or Dismiss filed by Defendants Interplastic Corporation (Interplastic) and North American Composites Company (NAC, and collectively "Defendants").[1] The United States District Judge referred this case to the undersigned United States Magistrate Judge for pretrial management, including the filing of a report and recommendation concerning dispositive motions. (Doc. 6). This Court recommends Defendants' Motion to Compel Arbitration be granted.

I.

Plaintiff Tigé Boats, Inc. (Tigé) is a Texas corporation that manufactures boats. Interplastic is a Minnesota-based manufacturer of resins and gel coats, among other products. Interplastic sells its products directly to customers and through distributors, including NAC. NAC, a Minnesota corporation, is a wholly owned subsidiary of a company that is itself a wholly owned subsidiary of Interplastic. This dispute arose when Tigé alleged that a "gelcoat" product it purchased from

[1] Defendants initially filed a Motion to Compel Arbitration in Doc. 15. Four days later they filed an Amended Motion to Compel Arbitration in Doc. 18. Both motions rely on the same brief, that being Doc. 17, with its exhibits. This Report and Recommendation treats Defendants' later-filed amended motion.

Defendants and applied to a large number of its boats malfunctioned, causing Tigé monetary damages. (*See* Doc. 1). The story of the motion before the Court, however, begins several years earlier.

On September 28, 2006, Tigé entered into an Open Account Agreement (OAA) with Defendants whereby Tigé would purchase "certain goods" from Defendants on credit terms. Defendants attached "a true and correct copy" of the OAA to their Motion to Compel as "Exhibit A." (*See* Doc. 17, pp. 6–7). Nowhere in the two-page OAA is the term "goods" defined. It is simply provided that "[s]ubject to the provisions of this Agreement, [Defendants] hereby [extend] credit to [Tigé] for the purpose of purchasing goods from [Defendants]." *Id.* at 6. Additionally, it is not clear the amount of goods or what specific goods were sold under the OAA. Defendants allege "[s]ince it signed that agreement, Tigé has made more than 400 purchases from NAC under that agreement." (Doc. 16, p. 5); (Doc. 17, p. 3) (Levy affidavit saying 434 purchases were made under the OAA). Tigé disputes that the purchases giving rise to this suit arose under the OAA. Tigé alleges the present dispute concerns purchases that occurred during 2013 and 2014 and unfolded as follows: Tigé would send a Purchase Order to Defendants, Defendants would in turn ship the requested product along with a Packing List. (Doc. 14, p. 10, para. 34). The Court refers to these transactions as the Purchase Order Transactions or POTs. Tigé alleges the POTs constituted the boundaries of the contract between the parties that give rise to suit. The documents involved in the POTs do not contain an arbitration provision. Generally, approximately one week after each POT, Defendants would send Tigé an Invoice, the back of which contained "Terms and Conditions of Sale." (*See* Doc. 1-3, p. 3–4). Tigé alleges the Invoices contained additional terms proposed subsequent to Defendants' acceptance of Tigé's POT, and thus were not part of the contract for goods. (*See generally* Doc. 14, pp. 6–7) (Tigé's amended complaint); (Doc. 24, pp. 14–17) (Tigé's

Response to Defendants' Motion to Compel); (Doc. 1-3, pp. 1–4) (Exhibit containing: Tigé's Purchase Order, NAC's Packing List, NAC's Invoice on the back of which were NAC's Terms and Conditions).

Tigé claims the POTs were not transactions on credit, and were not made under or pursuant to the OAA. (Doc. 24, p. 13 ("The [OAA] was executed in 2006 relating to purchases of product on credit; the 2013 and 2014 gelcoat contracts are the result of fulfilled purchase orders relating to the purchase of gelcoat, not on credit terms, and do not refer or relate to the [OAA].")). Tigé further claims that Defendants have not been consistent with which arbitration provision they seek to enforce. In their Demand for Arbitration, filed with the American Arbitration Association (AAA), Defendants claimed that two sets of terms and conditions, each of which contained an arbitration provision, were applicable—what Defendants call "Pre-2014 Terms & Conditions" and "2014 Terms & Conditions." (*See* Doc. 17, pp. 25–26). As Tigé points out, the Pre-2014 T&Cs are the same T&Cs found on the reverse side of the Invoices Defendants would send roughly one week after each of the POTs. (*See* Doc. 24, pp. 9–10). The 2014 T&Cs are the same T&Cs found on Defendants' website. *Id.* Thus, the Court refers to these two sets of T&Cs, and the corresponding arbitration provisions of each, by their location names for ease of reading, *i.e.*, Invoice T&Cs and Website T&Cs.

In their Motion to Compel, Defendants seek not to enforce the arbitration provisions in the Invoice T&Cs or Website T&Cs; instead, Defendants claim the OAA, with its arbitration provision, is operative. (Doc. 16). Accordingly, the Court considers only what Defendants bring their motion under, namely the OAA arbitration provision.

II.

As a threshold matter, before answering the question "is this dispute arbitrable," it must be determined from whom that question should emanate. That is, who decides the issue of arbitrability—the court or the arbitrator?

"Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original) (citation omitted). A court "will not assume that the parties agreed to arbitrate arbitrability 'unless the parties clearly and unmistakably provide otherwise.'" *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Express adoption of AAA Rules in an arbitration constitutes clear and unmistakable evidence that the parties have agreed to arbitrate arbitrability. *Id.* at 675.

Here, Section 3.1 of the OAA reads verbatim:

> Binding Arbitration. Except as otherwise provided herein, any and all unresolved disputes between the Seller and the Buyer shall be resolved by BINDING ARBITRATION under the rules of the American Arbitration Association. One arbitrator shall be used.

(Doc. 17, p. 7) (emphasis in original).

Tigé does not contest that Section 3.1 expressly adopts the AAA Rules, meaning Tigé does not make a substantive argument contesting that the OAA constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. Rather, Tigé disputes that the OAA applies to the claims at issue. Still, it is uncontested that the OAA delegates authority to the arbitrator to determine arbitrability, and if the OAA controls, as discussed further below, this case should be referred to arbitrator in the first instance.

III.

In the alternative, even if the courts are found to be the proper determiner of arbitrability, this case should be referred to the arbitrator for the reasons discussed below.

A.

"Arbitration is a matter of contract between the parties, and a court cannot compel a party to arbitrate a dispute unless the court determines the parties agreed to arbitrate the dispute in question." *Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998) (citing *AT&T*, 475 U.S. at 648 and *Neal v. Hardee's Food Sys.*, 918 F.2d 34, 37 (5th Cir. 1990)). "In adjudicating a motion to compel arbitration under the Federal Arbitration Act [(FAA)], courts generally conduct a two-step inquiry. The first step is to determine whether the parties agreed to arbitrate the dispute in question." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996). "The second step is to determine whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id.* at 258; *see also Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 214 (5th Cir. 2003). Determination of the first step "involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. When deciding whether the parties agreed to arbitrate the dispute in question, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Webb*, 89 F.3d at 258 (citation omitted).

B.

**Step One: Did the parties agree to arbitrate this dispute?**

*i. Is there a valid agreement to arbitrate between the parties?*

As noted, it is argued here that there are essentially two transaction records that encompass the purchases giving rise to this suit: the OAA and the POTs. The OAA contains one arbitration provision. The POTs contain two different arbitration provisions, those contained in the Invoice T&Cs and the Website T&Cs.

Tigé does not contest the existence of the OAA. (*See* Doc. 24, pp. 9–14). Nor does Tigé contest that the OAA contains on its reverse side Terms & Conditions which include an arbitration provision requiring arbitration under the AAA of "*any and all* unresolved disputes between the [Defendants] and [Tigé]," making such provision a "broad" arbitration provision, as discussed below. *Id.* (emphasis added). Finally, Tigé does not contest that it signed the OAA and is bound by its terms. The Invoice T&Cs contain an arbitration provision substantially similar to the OAA arbitration provision. (Doc. 17, p. 9). The Website T&Cs are very different from the Invoice T&Cs and the OAA. (*See* Doc. 17, pp. 11–15); (Doc. 24, p. 10).

These three documents constitute the potential sources of "a valid agreement to arbitrate between the parties." Again, Tigé claims it did not assent to the Invoice T&Cs or the Website T&Cs. Tigé claims the same constituted additional terms proposed by Defendants to Tigé following a completed contract—that of the POT.

Despite this plain disagreement about the Invoice T&Cs and Website T&Cs, there appears no disagreement that the OAA contains a valid agreement to arbitrate between the parties. Thus, Tigé concedes the first consideration at step one. Where Tigé attacks the OAA is in its scope,

which the Court examines as the second consideration under step one of asking whether the parties agreed to arbitrate this dispute.

*ii. Is the dispute in question within the scope of that arbitration agreement?*

"Whether the dispute falls within the arbitration agreement is a determination this court must make." *Pennzoil*, 139 F.3d at 1066. This Court must "resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. Arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Id.* (internal quotation marks omitted); *accord Marsh v. First USA Bank, N.A.*, 103 F.Supp.2d 909, 914 (N.D. Tex. May 23, 2000) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)).

Arbitration provisions can be "narrow" or "broad." Narrow clauses "only require arbitration of disputes 'arising out of' the contract," whereas broad clauses require arbitration of "disputes that 'relate to' or 'are connected with' the contract." *Pennzoil*, 139 F.3d at 1066 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397 – 98 (1967) (labeling as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"), and *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir. 1998) (holding that when parties agree to an arbitration clause governing "[a]ny dispute . . . arising out of or in connection with or relating to this Agreement," they "intend the clause to reach all aspects of the relationship.")). "Broad arbitration clauses . . . are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.* at 1067.

Tigé concedes that the arbitration provision in the OAA is a broad one. (Doc. 24, p. 13 ("The arbitration provision in the [OAA] is unquestionably 'broad' because it requires arbitration of 'all disputes' between the parties."). At first glance, then, it would appear that Tigé has forfeited the argument that the present dispute does not fall within the scope of the OAA arbitration provision. Surely the present dispute over "the purchase of gelcoat" "relates to" or has "a significant relationship to" the "purchase [of] certain goods." *See Pennzoil*, 139 F.3d at 1067. Or perhaps the OAA was intended to "reach all aspects of the relationship" between Tigé and Defendants. *See Nauru Phosphate*, 138 F.3d at 164–65. No, says Tigé, and the primary reason the Court can discern is that the OAA contemplates Tigé purchasing products on credit terms, and Tigé alleges the POTs were not made on credit terms. (Doc. 24, p. 13).[2]

Even broad arbitration provisions have their limits. *See Pennzoil*, 139 F.3d at 1067 n. 8. And the contention about whether the present dispute concerned a credit transaction is not lost on the Court. Still, considering the OAA's unquestionably broad arbitration provision and the policy of resolving doubts as to the scope of such provision in favor of arbitration, Tigé fails to convince the Court that the present dispute is outside the scope of the OAA's arbitration provision. It is a reasonable conclusion that the gelcoat product falls within the "certain goods" covered by the OAA. And a reasonable doubt exists as to whether the present dispute concerns a transaction on "credit terms" as contemplated by the OAA. For these reasons, the Court concludes the dispute between the parties falls within the broad scope of the OAA's arbitration provision. Therefore, at step one, the Court concludes the parties agreed to arbitrate the present dispute.

---

[2] Tigé makes an argument about timing as well, pointing out that the OAA and the POTs occurred "approximately 7 years apart." (Doc. 24, p. 14). However, Tigé does not explain why the passage of time alone would make the OAA's admittedly broad arbitration provision inapplicable to the POTs.

**Step Two: Do external legal constraints foreclose arbitration?**

Tigé has raised one potential external constraint which may foreclose arbitration of this case. Tigé states the OAA does not conform with Section 273.002 of the Texas Business and Commerce Code. (*See* Doc. 24, pp. 17–18). Section 273.002 provides:

> If a contract contains a provision making the contract or any conflict arising under the contract subject to another state's laws, litigation in the courts of another state, or arbitration in another state, that provision must be set out conspicuously in print, type, or other form of writing that is boldfaced, capitalized, underlined, or otherwise set out in such a manner that a reasonable person against whom the provision may operate would notice the provision.

TEX. BUS. & COM. CODE ANN. § 273.002.

As previously noted, Defendants filed a true and correct copy of the OAA along with their Motion to Compel Arbitration. (*See* Doc. 17, pp. 6–7). Section three of such is entitled "DISPUTE RESOLUTION." Section 3.1 reads verbatim:

> Binding Arbitration. Except as otherwise provided herein, any and all unresolved disputes between the Seller and the Buyer shall be resolved by BINDING ARBITRATION under the rules of the American Arbitration Association. One arbitrator shall be used.

(Doc. 17, p. 7) (emphasis in original).[3]

Despite only the words "binding arbitration" (the second usage) being set out in all caps, such selective use of emphasis actually makes the entire provision more noticeable. Visual attention is drawn to the critical words "BINDING ARBITRATION," which convey unmistakable meaning in the mind of a reasonable reader such that she would be caused to read Section 3.1 in its entirety. The Court notes this provision is not buried in a mountain of text either. The entire terms and conditions are one page long. The Court finds that in this case the setting out in all caps

---

[3] Though the copy filed of record is unclear on this point due no doubt to photocopying/scanning clarity and sharpness, the words "DISPUTE RESOLUTION" and the title "Binding Arbitration" appear to also be set out in bold font. (*See* Doc. 17, p. 7). If anything, such bolding only militates in favor of Defendants having satisfied the statutory standard.

of the two key words "BINDING ARBITRATION" satisfies the statutory requirement that the arbitration provision be "set out conspicuously . . . in such a manner that a reasonable person against whom the provision may operate would notice the provision." TEX. BUS. & COM. CODE ANN. § 273.002. Tigé presents no other legal constraints external to the parties' agreement which might foreclose arbitration of the claims in this suit. At step two, then, the Court finds no external legal constraints foreclose arbitration.

C.

The FAA provides in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Defendants request this case be stayed or dismissed under the above section. They allege they are not in default in proceeding with such arbitration, which was initiated prior to Tigé filing suit with this Court. Tigé does not make a counter argument, except as already annunciated by the Court herein above. The Court, therefore, concludes this case should be stayed pending the outcome of arbitration.

## IV. CONCLUSION

In sum, the Court finds the OAA's express adoption of AAA Rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate the arbitrability of this dispute. Therefore, as a threshold matter, this case should be referred to the arbitrator. In the alternative, in adjudicating the Motion to Compel, the Court concludes that at step one, the parties agreed to

arbitrate this dispute and no external legal constraints foreclose arbitration. For these reasons, the court proceedings in this case should be stayed under 9 U.S.C. § 3.

Considering the foregoing, it is **RECOMMENDED** that Defendants' Motion to Compel Arbitration (Doc. 18) be **GRANTED** and this case be **REFERRED TO THE ARBITRATOR.**

The proceedings in this case should be **STAYED** until arbitration has been had.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED.**

Dated this 24 day of September, 2015.

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**